UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 16-CR-00196 (ADM/LIB)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MICHAEL ROBERT GRANLEY,

    Defendant.

**GOVERNMENT'S SENTENCING POSITION PLEADING**

The United States, by its attorneys, Gregory G. Brooker, Acting United States Attorney for the District of Minnesota, and Carol M. Kayser, Assistant United States Attorney, hereby files this Position on Sentencing in support of its request that the Court sentence Defendant Michael Robert Granley to a term of imprisonment of 240 months following his conviction for Coercion and Enticement.

## I.    INTRODUCTION

Granley is a tenacious predator who engaged in a calculated scheme to obtain vagina pictures from numerous young girls. It appears that he also persuaded his young victims to masturbate on web cameras while he did the same. Granley is more than twice the age of his victims. Granley knew his conduct was unlawful, and he did it anyway. A sentence of 240 months is sufficient, but not greater than necessary to comply with the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation.

## II.     ARGUMENT AND CITATION OF AUTHORITIES

In 1984, Congress created the United States Sentencing Commission. *Mistretta v. United States*, 488 U.S. 361, 362, 366-367 (1989). The Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*, directed that Commission to promulgate uniform guidelines that would be binding on federal courts at sentencing. *Id*. at 367. One purpose of the Guidelines was to address and eliminate sentencing disparities among similarly situated offenders. *See Koon v. United States*, 518 U.S. 81, 113 (1996); 28 U.S.C. § 991 (b)(1)(B). Congressional statutes instruct the Commission to carry out the objectives of 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007). Significantly, as the United States Supreme Court observed in *Rita*:

> The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill this statutory mandate. They also reflect that the fact that different judges (and others) can differ as to how best to reconcile the disparate ends of punishment. . . . [I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives

551 U.S. at 349, 350. Consequently, although the Guidelines are no longer mandatory, *see United States v. Booker*, 543 U.S. 220, 245-258 (2005), "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). "The post-*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark

through the process of appellate review." *Peugh v. United States*, __U.S.__, 133 S.Ct. 2072, 2083 (2013).

In *Gall*, the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. *Id.* at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

A.  The Guidelines Range

The Government submits that the Presentence Report ("PSR") issued June 26, 2017, correctly calculates the applicable advisory Guidelines range. The PSR differs from the PA, however, by virtue of the application of a two-level enhancement under U.S.S.G. §3B1.4 with respect to each victim. *See* PSR ¶¶ 32, 38, 44. This enhancement was not calculated by the parties in the PA, and the Government agrees that it is bound by the terms of the PA. This discrepancy is of little import, however, because Granley's base offense level is so high, U.S.S.G. Chapter 5, Part A, Application Note 2 applies, which results in a final adjusted offense level of 43. *See* PSR ¶ 55. This is the same final adjusted offense level calculated by the parties in the PA. PA ¶ 7f.

The PSR also differs from the PA in that the PSR calculates a Criminal History Category of VI. PSR ¶ 86. The parties did not stipulate in the PA to Granley's Criminal History Category. PA ¶ 7g. Rather, the parties indicated they believed that his Criminal

History Category was III or IV. *Id.* This discrepancy too is of little import, as the advisory Guidelines imprisonment range is the same whether Granley is a III, IV, or VI: life.

B.  An Examination Of The 3553(a) Factors Demonstrates That A Sentence Of 240 Months' Imprisonment Is Appropriate

The district court may not assume that the Guidelines range is reasonable, but instead must make an individualized assessment based on the facts presented. *Gall*, 552 U.S. at 50. Section 3553(a) requires the Court to analyze a number of factors, including the history and characteristics of the defendant, the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, the need for deterrence, and the need to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a). An analysis of these factors shows that a sentence of 240 months' imprisonment is appropriate. Whether termed a downward departure under U.S.S.G. §5H1.3, or a downward variance based on Granley's history and characteristics, the Government believes that a sentence of 240 months' imprisonment is sufficient, but not greater than necessary, to satisfy the purposes of criminal sentencing. A sentence below 240 months' imprisonment is not warranted.

1.  History and Characteristics of the Defendant

Section 3553(a)(1) directs the sentencing court to consider the history and characteristics of the defendant. Granley had a comfortable upbringing in a two-parent household in rural Minnesota. PSR ¶¶ 96, 97. His father owned the local grocery store, and his mother was a first-grade teacher. *Id.* ¶ 96. His childhood home is across the street from Clearbrook Lake. *Id.* By any measure, he had an idyllic upbringing.

Although he was born with a mild form of cerebral palsy, Granley overcame that disability to graduate from high school. PSR ¶¶ 101, 112. He went on to take courses at Northwest Technical College in Bemidji, where he earned 22 credits. *Id.* ¶ 113. Granley accomplished these mileposts despite a reported below-average IQ. *Id.* ¶ 106. Beginning in 1993, and until his arrest in July 2016, Granley worked steadily as a referee for multiple school districts, refereeing high school basketball, football, and baseball games. *Id.* ¶ 117. He also worked for a time as an after-hours security guard, until he was fired for theft. *Id.* ¶ 61.

Granley has had multiple run-ins with the law as an adult, typically theft-related. *See* PSR ¶¶ 61-84. Indeed, Granley has ten theft-related convictions, *not* including convictions for financial transaction card fraud, two worthless check charges, and receiving stolen property. *Id.* ¶¶ 61-63, 66, 69-73, 75-78, 81. He has two convictions for disorderly conduct, one of which originated as a domestic assault of his 19-year old live-in girlfriend. *Id.* ¶¶ 64, 74. Finally, he was convicted of two counts of criminal damage to property for arson related activity. *Id.* ¶ 68.

Granley has even victimized his own family members. When he was 30-years old, he used his sister's credit card without permission. PSR ¶ 66. It also appears from the PSR that he stole money from her. *Id.* ¶ 96. As mentioned, he also slapped his domestic partner. *Id.* ¶ 74. Granley's father reported that he was not "aware of the full extent" of his son's criminal history, and that Granley is "hard to trust because of his history of stealing and unstable financial situations." *Id.* ¶ 99.

It appears that Granley has had a longstanding interest in pursuing relationships with much younger women. In addition to the five minor victims identified in the PSR, at least two of Granley's girlfriends appear to have been significantly younger. In February 2008, when Granley was 34-years old, he was living with a 19-year old girlfriend. PSR ¶ 74. In 2009, when Granley was 36-years old, he started dating his daughter's mother, who appears to have been 18 or 19 years old at the time.[1] *Id. at* ¶ 98.  Not unlike what happened in this case, Granley met Ms. Chosa online and, one month later, moved in with her. *Id.* Significantly, Granley's father reported that he and his wife had "concern for the defendant around minors." *Id.* ¶ 99.

Certainly, Granley's cerebral palsy and reported below-average IQ are mitigating factors. The Government has recognized those factors in recommending a below-the-Guidelines sentence. Nonetheless, Granley has a lengthy criminal history resulting in repeated interactions with the criminal justice system. *See* PSR ¶¶ 61-84, 88-94. Those interactions did not curb Granley's illegal behaviors or cause him to become law-abiding. Further, Granley knew his exploitation of his minor victims was illegal. He simply did not care. Inasmuch as Granley has fathered a child with Ms. Chosa, it is clear that Granley is willing and able to engage in hands-on sexual behavior with much younger females. Further, in light of his conduct in this case, it is clear that he his sexually attracted to teenage girls. Granley's history and characteristics compel a significant sentence of 240 months' imprisonment.

---

[1] It is unclear if she was still in high school when she began dating Granley.

2.      Nature and Circumstances of the Offense

Pursuant to Section 3553(a)(1), the sentencing court must also consider the nature and circumstances of the offense. Granley committed serious crimes that are deserving of appropriately serious punishment. He engaged in a persistent scheme designed to sexually exploit young girls for his own sexual satisfaction. PSR ¶ 8. His victims were as young as 11-years old. *Id.* Tellingly, Granley carefully targeted his victims, selecting vulnerable girls who craved attention. Minor #1, for example, lived with her grandmother because her mother was a drug addict. *Id.* ¶ 9. She ran away from home several times before "meeting" Granley on-line in the Facebook group "emo-scene-weird." *Id.* During the time she was communicating with Granley, she attempted suicide. *Id.* To ensure his access to her, Granley sent Minor #1 a cell phone. *Id.* Minor #2 lived with her grandparents. *Id.* ¶ 13. When she met Granley online she had a history of cutting behaviors. *Id.* Similarly, Minor #3 lived with her grandmother. *Id.* ¶ 15. She used two screen-names when communicating with Granley: "broken beyond repair" and "Broken Once Again." *Id.* Similar to Granley's other victims, Minor #3 engaged in cutting behaviors and reported that she had been suicidal in her life.[2] *Id.* By way of example of the vulnerability of Granley's victims, Minor #3 wrote him the following in January 2016:

> Thank you for being the reason for me to wake up in the morning. Thank you for loving me. Thank you for always telling me how much you care. Thank you for making me feel like a princess. Thank you for being an amazing fiance and bf [boyfriend]. Most of all thank you for trying to help me quit cutting and attempting suicide. That means a lot to me.

---

[2] It appears from A.P.'s communications with Granley that she was also a cutter.

7

Granley responded:

> Ur welcome baby girl. I love you more than anything in this world. Well my daughter is number one and ur number two. But I love you a lot.[3]

When Minor #3 reported that she had been bullied at school because of her size, Granley assumed the role of protector: "That's fucking messed up. I wanna come there and fucking kill them. Make them fucking suffer and shit. Dump them in acid. That's a painful death."

Granley's targets were easy prey for the manipulative adult, a man who was more than twice the ages of his victims. In his communications, Granley would typically flatter his intended victim, complimenting her appearance. He would eagerly send his victim pictures of his penis, and he would encourage his victim to reciprocate with pictures of her breasts and vagina. He would quickly label the relationship as "boyfriend/girlfriend" or "fiances." Granley knew these were magic titles for his victims, who craved love and attention. Likewise, Granley quickly proclaimed his "love" and commitment. For example, he told Minor #1 in October 2015:

> My friends asked me about your age. I told them ur 16. They said just becareful. [sic] They said also as long as you love her that's all that matters. I told my friends that ur the one I wanna spend the rest of my life with you. . . .. And they said. Awwwwww. . . . They said finally u found a good, sweet, caring girl who won't cheat on you. I showed them ur pic. They said (Damn, she's attractive)."

Of course, Granley was not sincere in his proclamations, as he had overlapping relationships, engaging in communications with more than one minor victim at the same time. When a victim would appear to be losing interest, Granley would attempt to guilt the

---

[3] Granley made similar proclamations to Minor #1, with whom Granley communicated simultaneously.

girl to keep her interested. For example, when Granley suspected that Minor #1 might be dating someone else, he wrote, "I'm gonna go and hide in a hole and be by myself. I'm a loser. Nobody wants me or cares about me. I'm useless." He also regularly sent "crying emojis" when he felt neglected. In one instance, he sent Minor #1 a picture of himself crying.

Not only did Granley persuade his victims to produce child pornography (PSR ¶¶ 10, 11, 14, 17, 57, 58), he engaged in graphic, sexual chats with his victims. He told Minor #1, "When we are together. Ur not gonna be a vegetarian. I got some meat you can suck on. Lol." He told her "I wanna see ur pussy. And lick it." He asked Minor #1, "Where do you want my dick.. . . Do you wanna put it in ur ass." Shortly after "meeting" A.P. online in November 2015, he asked her if she wanted to "fuck" him. During the conversation, he implied that he was going to go to the bathroom and masturbate. When she responded, "omfg [oh my fucking God]," he replied, "I'm kidding. . . . U can play with it. . . . What do u wanna do with it." Thereafter he sent her a picture of his erect penis and asked, "Where do u want that." He repeatedly suggested that they "trade pics." He told her that he wanted to "taste" her "pussy." Several times he asked what her parents would say when he got her pregnant, "[b]ecuz of the age difference." Granley told A.P. that he would buy a promise ring and that he would love her and be with her "forever." He repeatedly suggested that they go "on cam and watch each other." Based on the conversations between Granley and Minor #1, it appears that they regularly masturbated together on a web camera.

The nature and circumstances of Granley's conduct here demonstrate that he is a sick, perverted predator who repeatedly corrupted and manipulated young girls to satisfy

9

his own sexual urges. His victims, because of their life circumstances, were easily vulnerable to his manipulation. The nature and the circumstances of Granley's actions support the requested sentence.

### 3.    The Need for Deterrence

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages Granley from engaging in these behaviors again. Granley knew that what he was doing was wrong, but he chose to do it anyway. As reflected in the PSR, Granley has had multiple run-ins with law enforcement. *See* PSR ¶¶ 61-84, 88-94. While under sentence, he repeatedly violated the terms of his probation and engaged in new offense conduct. *Id.* at ¶¶ 61, 69, 71-74. Leniency did not prompt Granley to become law abiding. Perhaps it only emboldened him. A significant sentence of 240 months' imprisonment is an appropriate attempt to deter Granley from committing crimes again in the future.

A significant sentence is also important as a general deterrent. General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress has specifically made general deterrence an appropriate consideration under 3553(a)(2)(B), [it is] one of the key purposes of sentencing." *Ferguson v. United States*, 623 F.3d 627, 631-32 (8th Cir. 2010). Moreover, Congress, the United States Supreme Court, and the United States Sentencing Commission have made clear that general deterrence is an important sentencing goal in child pornography offenses. *See United States v. Irey,* 612 F.3d 1160, 1206 (11th Cir. 2010) ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography]

by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product") (*citing Ferber,* 458 U.S. at 760), *cert. denied,* 563 U.S. 917 (2011). Child pornography is a pervasive blight on society that continues to spread. Unfortunately, with the advent of the internet and the use of various social media platforms, the internet has become a powerful tool for would-be child abusers like Granley.[4] The Court is in a position to send a strong message to people like Granley who use the internet to exploit children for their own sexual gratification. A sentence of 240 months' imprisonment is appropriate as both an individual deterrent and a general deterrent.

    4.    <u>The Need To Protect The Public From Further Crimes Of This Defendant</u>

In sentencing Granley, the Court must weigh the need to protect the public from his future crimes. *See* 18 U.S.C. § 3553(a)(2)(C). In considering his likelihood of recidivism, "a court may take into account any evidence of obvious incorrigibility and conclude that leniency has not been effective." *United States v. Gant*, 663 F.3d 1023, 1030 (8th Cir. 2011) (*quoting United States v. Walking Eagle*, 553 F.3d 654, 657 (8th Cir. 2009)); "[E]ven offenses which are minor and dissimilar to the instant crime may serve as evidence of likelihood of recidivism if they evince defendant's incorrigibility." *United States v. Schwalk*, 412 F.3d 929, 933 (8th Cir. 2005) (court did not abuse its discretion in considering

---

[4] *See e.g., United States v. Anton Martynenko,* 16-CR-013 (RHK), (the defendant posed on Facebook as a female to solicit child pornography from more than 150 minor male victims); *United States v. John James DeNicola,* 16-CR-088 (JNE), (using teenchat.com, the defendant met a purported 13-year old girl from Minnesota; the defendant was arrested after he flew to Minnesota from Georgia to have sex with the 13-year old, who was really an undercover law enforcement agent).

11

defendant's history of relatively minor offenses that were not counted in his criminal history score in departing upward) (quoting *United States v. Agee*, 333 F.3d 864, 867 (8th Cir. 2003)); *accord, United States v. Herr*, 202 F.3d 1014, 1017 (8th Cir. 2000) (no abuse of discretion in departing upward under § 4A1.3 where defendant's repeated violations showed disrespect for law and that leniency had not been effective).

Granley's conduct on probation, as well as his conduct in this case, demonstrate a substantial risk of recidivism. As discussed above and detailed in the PSR, Granley has had multiple run-ins with law enforcement. PSR ¶¶ 61-84, 88-94. He repeatedly received lenient sentences. *Id.*¶¶ 61-84. Nonetheless, he repeatedly violated his probationary sentences. *Id.* ¶¶ 61, 69, 71-74. Clearly, leniency was not effective in promoting respect for the law.

Granley knew that his relationships with the victims here were unlawful, but he cultivated those relationships anyway. He needed the sexual gratification. Further, when Granley learned that police had executed a search warrant at his residence, he wiped his electronics in an attempt to remove any incriminating evidence. PSR ¶ 18. He also directed at least one of his victims to erase his messages to her. *Id.* When police ultimately arrested Granley, he took off running after law enforcement pulled over his car. *See* ECF #17. He abandoned his young daughter when he ran, leaving her strapped in her car seat. *Id.* He resisted arrest even when the case agent caught up to him, struggling to get away. *Id.*

The magistrate judge initially ordered Granley detained pending trial. ECF #17. After two months in jail, Granley filed a Motion for Reconsideration, seeking release to a halfway house with GPS monitoring. ECF #35. At the hearing on that Motion, Granley

represented, through counsel, that he was scared and that he appreciated the severity of his situation. He assured the court that he was neither a flight risk, nor a danger to the community. Granley was not truthful. Less than a month after the Magistrate Judge granted Granley's Motion (ECF #39), he escaped the halfway house (ECF #44-#46). That escape involved substantial planning on his part.[5] Instead of attending a scheduled therapy session, Granley went to a nearby Walmart, proceeded to the gardening department, grabbed some hedge shears, cut off his GPS bracelet, and fled the Twin Cities. *See* ECF #46. He was ultimately arrested in Wisconsin. PSR ¶ 21. Not only did Granley leave the state, but he also obtained a smart-phone with internet capabilities and activated a Facebook account. Under his conditions of release, Granley was prohibited from possessing or using a computer, or accessing any on-line services. ECF #39. Further, although he was prohibited from having any contact with anyone under 18-years old, he appears to have done so. When law enforcement found him to arrest him, he again tried to flee.  ECF #55.

Given Granley's history on probation, together with his history in this case, it is clear that Granley either will not, or cannot, remain law abiding. He will do what he wants to do, when he wants to do it. Further, given his documented attraction to minor girls, he poses a significant danger to the public. Consequently, a sentence of 240 months' imprisonment is necessary to protect the public from Granley's further crimes.

---

[5] According to reports, prior to his escape, Granley hid a suitcase outside the half-way house.

5.      The Need To Avoid Unwarranted Sentencing Disparities

A sentence of 240 months in custody also serves the goal of avoiding unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). In *United States v. Mills,* 843 F.3d 210 (5th Cir. 2016), the defendant pleaded guilty to violating 18 U. S.C. § 2422(b) and was sentenced to 300 months' imprisonment. *Id.* at 212. The defendant in *Mills* responded to a Craigslist ad purportedly posted by a mom, really an undercover officer, with two children looking for "family fun." *Id.* The defendant asked for photographs of the two children. *Id.* After receiving two "dummy-photographs," the defendant sent the mom explicit photographs of himself and asked "her" to show the photographs to her children. *Id.* The defendant also described various sex acts he intended to engage in with the children. *Id.* Law enforcement arrested the defendant after he drove to a hotel to engage in sexual activity with the children. *Id.* The defendant's base offense level was 35, his criminal history category was V, and his resulting advisory Guidelines range was 262-327 months of imprisonment. *Id.* at 213. The appellate court rejected the defendant's Eighth Amendment challenge to his sentence. *Id.* at 218.

In *United States v. Nagel,* 835 F.3d 1371 (11th Cir. 2016), the defendant was convicted of three counts of violating 18 U.S.C. § 2422(b) and sentenced to 292 months' imprisonment. Similar to Granley, the defendant in *Nagel* used social media accounts to engage in sexually explicit conversations with two minor females and to solicit explicit photographs. *Id.* at 1373. Although the defendant engaged in sexual activity with his victims, his advisory Guidelines range was actually lower than Granley's. *Id*. Specifically, Nagel's total offense level was 39, and his criminal history category was II, resulting in an

14

advisory Guidelines range of 292-365 months. *Id*. The appellate court rejected the defendant's challenge to the reasonableness of the sentence, finding that the trial court's "imposed sentence was within the reasonable range of sentences warranted by the facts." *Id.* at 1376.

In *United States v. Dunfee,* 821 F.3d 120 (1st Cir. 2016), the defendant was found guilty of coercion and enticement of a minor, as well as the sexual exploitation of a child. The district court sentenced the defendant to 240 months' imprisonment. *Id.* at 127. In *Dunfee*, the defendant created a fictitious Facebook page for a photography studio and held himself out as an employee of the studio. *Id.* at 124. The defendant began communicating with an adult female who was interested in working as a model. *Id.* The woman had a 10-year old daughter. *Id.* The defendant offered the mother $20,000 for a mother-daughter bikini modeling contract, but he insisted that the mother and daughter would need to audition via Skype. *Id.* During the Skype "audition," the defendant directed the mother to pose her daughter in front of a webcam wearing only a bra and panties. *Id.* Also at the defendant's direction, the mother manipulated her daughter's underwear and agreed to shave the daughter's pubic area. *Id.* The mother later returned her daughter to the Skype audition fully nude and followed the defendant's instructions to display her daughter's genitalia. *Id.* As here, the PSR calculated an advisory Guidelines range of life imprisonment. *Id.* at 126. The sentencing court considered a number of mitigating circumstances in sentencing the defendant to a below-the-Guidelines sentence of 240 months' imprisonment, including the defendant's work history, the fact that he had not

physically touched his victims, and that he suffered from an anxiety disorder. *Id.* at 133. The appellate court found that the sentence was substantively reasonable. *Id.* at 133-34.

In *United States v. Hammond,* 698 F.3d 679 (8th Cir. 2012), the defendant was convicted of one count of coercion and enticement and one count of sexual exploitation of a child. *Id.* at 680. His advisory Guidelines range was 235-292 months' imprisonment. *Id.* The sentencing court imposed two concurrent sentences of 240 months' imprisonment. *Id.* In affirming the sentence, the Eighth Circuit rejected the defendant's claim that the sentencing court had abused its discretion in not granting a downward variance. *Id.* at 681.

In *United States v. Zahursky,* 668 F.3d 456 (7th Cir. 2012), the defendant engaged in "graphic," sexually explicit conversations with two purported 14-year old girls in an on-line chat room. *Id.* at 457. His conversations "expressed a strong desire to" engage in a "threesome" with teenage girls.[6] *Id.* Law enforcement arrested the defendant en route to meet two fictitious minors. *Id.* at 458. He was convicted of attempting to entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b) and sentenced to 210 months' imprisonment. *Id.*

Granley's conduct here is far worse than or on par with the conduct of the defendants in the cases cited above. While Granley reportedly has a below-average IQ, he can distinguish right from wrong. Indeed, as part of his scheme he researched the age-of-

---

[6] Granley engaged in similarly graphic conversations with his victims. For example, in a January 10, 2016, online chat between Granley and Minor #3, Granley proposed a threesome with another 15-year old girl. He wrote: "Now we found a girl for our threesome. . . . U can go from ugly me To sexy her. . . . U should send me a pic of her." The next day, Granley suggested that Minor #3's younger twin cousins could watch Minor #3 and Granley have sex.

consent laws in various states. PSR ¶ 8. He also urged his victims not to tell anyone about their relationships with him, recognizing that he would get arrested. Further, unlike the conduct in *Mills, Dunfee,* and *Zahursky,* Granley's scheme persisted several months, involved numerous real minor victims, and the production of multiple images of child pornography. There is also evidence that Granley intended or planned to meet up with his victims. He researched directions to his victims' homes, nearby hotels, and the cost of gas.[7] PSR ¶¶ 10, 57, 58. He even reserved a hotel room to meet up with Minor #1. *Id.* ¶ 10. Granley is not a harmless, socially inept oddball. Rather, he is a dangerous predator. His criminal history includes violent, senseless acts. *Id.* at ¶¶ 68, 74. A sentence of 240 months' imprisonment is necessary to avoid unwarranted sentencing disparities.

C.   A Supervised Release Term Of Life Is Appropriate Under The Circumstances Present Here

Supervised release "is a unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), that "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). It "is not punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Rather, "congressional policy in providing for a term of supervised release after

---

[7] It appears that lack of travel money prohibited Granley from meeting his victims. In a September 1, 2015, online conversation with Minor #1, Granley complained that if he did not have a $579.73 phone bill, he would "have enough money for gas and a few nights at a hotel." He explained that gas "from me to you is about $100." Similarly, in a November 9, 2015, online conversation between Granley and A.P. (see PSR ¶ 58), who was 16-years old, Granley promised, "When I get gas money. I will totally come see you." *See also* PSR ¶ 16.

17

incarceration is to improve the odds of a successful transition from the prison to liberty," *Johnson v. United States*, 529 U.S. 694, 708-09 (2000).

In the main, Congress authorized only short terms of supervised release. For class A felonies, the most serious category of federal offenses, a supervised release term ordinarily may not exceed five years. 18 U.S.C. § 3583(b)(1). Child exploitation crimes, however, fall into a discrete group of offenses for which Congress went further, mandating a minimum supervised release term of five years and authorizing a maximum term of life. *Id.* § 3583(k). Of course, this suggests that Congress saw a grave danger to public safety from individuals who seek to exploit children, beyond the danger posed by a run-of-the-mine felon. Indeed, the Guidelines urge district courts to impose the maximum term available for sex offenders like Granley. *See* U.S.S.G. §5D1.2(b). Granley's persistent scheme to satisfy his sexual attraction to young girls reflects that he is in need of treatment. A life term of Supervised Release is necessary to ensure that he does not relapse into his exploitative behavior and resume corrupting vulnerable minor victims. The parties recognized this need in the Plea Agreement: "the parties agree that they will both request a term of Supervised Release of life." Plea Agreement ¶ 7j. Accordingly, the Government urges the Court to impose a Supervised Release term of life.

### III. <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully asks the Court to sentence Granley to 240 months' imprisonment, followed by a life term of Supervised Release. The requested sentence is commensurate with Granley's criminal conduct and

consistent with the Section 3553(a) factors. Most importantly, under all the facts and circumstances of this case, it is also fair and just.

Dated: July 18, 2017

Respectfully Submitted,

GREGORY G. BROOKER
Acting United States Attorney

*s/ Carol M. Kayser*

BY:  CAROL M. KAYSER
Assistant U.S. Attorney

316 North Robert Street
Suite 404
Saint Paul, Minnesota 55101
(651)848-1926